# CONNECTICUT ET AL. *v.* TEAL ET AL.

No. 80–2147.   Argued March 29, 1982—Decided June 21, 1982

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined, *post*, p. 456.

*Bernard F. McGovern, Jr.*, Assistant Attorney General of Connecticut, argued the cause for petitioners. With him on the briefs were *Carl R. Ajello*, Attorney General, *Peter W. Gillies*, Deputy Attorney General, and *Robert E. Walsh, Sidney D. Giber*, and *Thomas P. Clifford III*, Assistant Attorneys General.

*Thomas W. Bucci* argued the cause for respondents. With him on the brief was *Sidney L. Dworkin.**

JUSTICE BRENNAN delivered the opinion of the Court.

We consider here whether an employer sued for violation of Title VII of the Civil Rights Act of 1964[1] may assert a "bottom-line" theory of defense. Under that theory, as asserted in this case, an employer's acts of racial discrimination in promotions—effected by an examination having disparate impact—would not render the employer liable for the racial discrimination suffered by employées barred from promotion if the "bottom-line" result of the promotional process was an appropriate racial balance. We hold that the "bottom line" does not preclude respondent employees from establishing a prima facie case, nor does it provide petitioner employer with a defense to such a case.

## I

Four of the respondents, Winnie Teal, Rose Walker, Edith Latney, and Grace Clark, are black employees of the Department of Income Maintenance of the State of Connecticut.[2]

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Solicitor General Wallace, Harriet S. Shapiro, Brian K. Landsberg, David L. Rose,* and *Joan A. Magagna* for the United States; by *Robert E. Williams* and *Douglas S. McDowell* for the Equal Employment Advisory Council et al.; and by *Leonard S. Janofsky* and *Paul Grossman* for the National League of Cities et al.

Briefs of *amici curiae* urging affirmance were filed by *J. Albert Woll, Robert M. Weinberg, Michael H. Gottesman,* and *Laurence Gold* for the American Federation of Labor and Congress of Industrial Organizations; and by *Richard C. Dinkelspiel, William L. Robinson, Norman J. Chachkin,* and *Beatrice Rosenberg* for the Lawyers' Committee for Civil Rights Under Law.

[1] Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV).

[2] The black respondents were joined as plaintiffs by four white employees on a pendent claim that the written test violated provisions of state law that require promotional exams to be job related. That claim is not before us. See 645 F. 2d 133, 135, n. 3 (CA2 1981).

Each was promoted provisionally to the position of Welfare Eligibility Supervisor and served in that capacity for almost two years. To attain permanent status as supervisors, however, respondents had to participate in a selection process that required, as the first step, a passing score on a written examination. This written test was administered on December 2, 1978, to 329 candidates. Of these candidates, 48 identified themselves as black and 259 identified themselves as white. The results of the examination were announced in March 1979. With the passing score set at 65,[3] 54.17 percent of the identified black candidates passed. This was approximately 68 percent of the passing rate for the identified white candidates.[4] The four respondents were among the blacks who failed the examination, and they were thus excluded

---

[3] The mean score on the examination was 70.4 percent. However, because the black candidates had a mean score 6.7 percentage points lower than the white candidates, the passing score was set at 65, apparently in an attempt to lessen the disparate impact of the examination. See *id.*, at 135, and n. 4.

[4] The following table shows the passing rates of various candidate groups:

| Candidate Group | Number | No. Receiving Passing Score | Passing Rate (%) |
|---|---|---|---|
| Black | 48 | 26 | 54.17 |
| Hispanic | 4 | 3 | 75.00 |
| Indian | 3 | 2 | 66.67 |
| White | 259 | 206 | 79.54 |
| Unidentified | 15 | 9 | 60.00 |
| Total | 329 | 246 | 74.77 |

Petitioners do not contest the District Court's implicit finding that the examination itself resulted in disparate impact under the "eighty percent rule" of the Uniform Guidelines on Employee Selection Procedures adopted by the Equal Employment Opportunity Commission. See App. to Pet. for Cert. 18a, 23a, and n. 2. Those guidelines provide that a selection rate that "is less than [80 percent] of the rate for the group with the highest rate will generally be regarded . . . as evidence of adverse impact." 29 CFR § 1607.4D (1981).

from further consideration for permanent supervisory positions. In April 1979, respondents instituted this action in the United States District Court for the District of Connecticut against petitioners, the State of Connecticut, two state agencies, and two state officials. Respondents alleged, *inter alia*, that petitioners violated Title VII by imposing, as an absolute condition for consideration for promotion, that applicants pass a written test that excluded blacks in disproportionate numbers and that was not job related.

More than a year after this action was instituted, and approximately one month before trial, petitioners made promotions from the eligibility list generated by the written examination. In choosing persons from that list, petitioners considered past work performance, recommendations of the candidates' supervisors and, to a lesser extent, seniority. Petitioners then applied what the Court of Appeals characterized as an affirmative-action program in order to ensure a significant number of minority supervisors.[5] Forty-six persons were promoted to permanent supervisory positions, 11 of whom were black and 35 of whom were white. The overall result of the selection process was that, of the 48 identified black candidates who participated in the selection process, 22.9 percent were promoted and of the 259 identified white candidates, 13.5 percent were promoted.[6] It is this "bottom-line" result, more favorable to blacks than to whites, that petitioners urge should be adjudged to be a complete defense to respondents' suit.

After trial, the District Court entered judgment for petitioners. App. to Pet. for Cert. 18a. The court treated respondents' claim as one of disparate impact under *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971), *Albemarle Paper Co.*

---

[5] Petitioners contest this characterization of their selection procedure. We have no need, however, to resolve this dispute in the context of the present controversy.

[6] The actual promotion rate of blacks was thus close to 170 percent that of the actual promotion rate of whites.

v. *Moody*, 422 U. S. 405 (1975), and *Dothard* v. *Rawlinson*, 433 U. S. 321 (1977). However, the court found that, although the comparative passing rates for the examination indicated a prima facie case of adverse impact upon minorities, the result of the entire hiring process reflected no such adverse impact. Holding that these "bottom-line" percentages precluded the finding of a Title VII violation, the court held that the employer was not required to demonstrate that the promotional examination was job related. App. to Pet. for Cert. 22a–24a, 26a. The United States Court of Appeals for the Second Circuit reversed, holding that the District Court erred in ruling that the results of the written examination alone were insufficient to support a prima facie case of disparate impact in violation of Title VII. 645 F. 2d 133 (1981). The Court of Appeals stated that where "an identifiable pass-fail barrier denies an employment opportunity to a disproportionately large number of minorities and prevents them from proceeding to the next step in the selection process," that barrier must be shown to be job related. *Id.*, at 138. We granted certiorari, 454 U. S. 813 (1981), and now affirm.

## II

### A

We must first decide whether an examination that bars a disparate number of black employees from consideration for promotion, and that has not been shown to be job related, presents a claim cognizable under Title VII. Section 703 (a)(2) of Title VII provides in pertinent part:

"It shall be an unlawful employment practice for an employer—

. . . . .

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as

an employee, because of such individual's race, color, religion, sex, or national origin." 78 Stat. 255, as amended, 42 U. S. C. § 2000e–2(a)(2).

Respondents base their claim on our construction of this provision in *Griggs* v. *Duke Power Co., supra.* Prior to the enactment of Title VII, the Duke Power Co. restricted its black employees to the labor department. Beginning in 1965, the company required all employees who desired a transfer out of the labor department to have either a high school diploma or to achieve a passing grade on two professionally prepared aptitude tests. New employees seeking positions in any department other than labor had to possess both a high school diploma and a passing grade on these two examinations. Although these requirements applied equally to white and black employees and applicants, they barred employment opportunities to a disproportionate number of blacks. While there was no showing that the employer had a racial purpose or invidious intent in adopting these requirements, this Court held that they were invalid because they had a disparate impact and were not shown to be related to job performance:

> "[Title VII] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." 401 U. S., at 431.

*Griggs* and its progeny have established a three-part analysis of disparate-impact claims. To establish a prima facie case of discrimination, a plaintiff must show that the facially neutral employment practice had a significantly discriminatory impact. If that showing is made, the employer must then demonstrate that "any given requirement [has] a manifest relationship to the employment in question," in order to

avoid a finding of discrimination. *Griggs, supra,* at 432. Even in such a case, however, the plaintiff may prevail, if he shows that the employer was using the practice as a mere pretext for discrimination. See *Albemarle Paper Co., supra,* at 425; *Dothard, supra,* at 329.[7]

*Griggs* recognized that in enacting Title VII, Congress required "the removal of artificial, arbitrary, and unnecessary barriers to employment" and professional development that had historically been encountered by women and blacks as well as other minorities. 401 U. S., at 431. See also *Dothard* v. *Rawlinson, supra.*[8] *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973), explained that

> "*Griggs* was rightly concerned that childhood deficiencies in the education and background of minority citizens, resulting from forces beyond their control, not be allowed to work a cumulative and invidious burden on such citizens for the remainder of their lives." *Id.,* at 806.

---

[7] Petitioners apparently argue both that the nondiscriminatory "bottom line" precluded respondents from establishing a prima facie case and, in the alternative, that it provided a defense.

[8] The legislative history of the 1972 amendments to Title VII, 86 Stat. 103–113, is relevant to this case because those amendments extended the protection of the Act to respondents here by deleting exemptions for state and municipal employers. See 86 Stat. 103. That history demonstrates that Congress recognized and endorsed the disparate-impact analysis employed by the Court in *Griggs.* Both the House and Senate Reports cited *Griggs* with approval, the Senate Report noting:

"Employment discrimination as viewed today is a . . . complex and pervasive phenomenon. Experts familiar with the subject now generally describe the problem in terms of 'systems' and 'effects' rather than simply intentional wrongs." S. Rep. No. 92–415, p. 5 (1971).

See also H. R. Rep. No. 92–238, p. 8 (1971). In addition, the section-by-section analyses of the 1972 amendments submitted to both Houses explicitly stated that in any area not addressed by the amendments, present case law—which as Congress had already recognized included our then recent decision in *Griggs*—was intended to continue to govern. 118 Cong. Rec. 7166, 7564 (1972).

Petitioners' examination, which barred promotion and had a discriminatory impact on black employees, clearly falls within the literal language of § 703(a)(2), as interpreted by *Griggs.* The statute speaks, not in terms of jobs and promotions, but in terms of *limitations* and *classifications* that would deprive any individual of employment *opportunities.*[9] A disparate-impact claim reflects the language of § 703(a)(2) and Congress' basic objectives in enacting that statute: "to achieve equality of employment *opportunities* and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." 401 U. S., at 429-430 (emphasis added). When an employer uses a non-job-related barrier in order to deny a minority or woman applicant employment or promotion, and that barrier has a significant adverse effect on minorities or women, then the applicant has been deprived of an employment *opportunity* "because of . . . race, color, religion, sex, or national origin." In other words, § 703(a)(2) prohibits discriminatory "artificial, arbitrary, and unnecessary barriers to employment," 401 U. S., at 431, that "limit . . . or classify . . . applicants for employment . . . in any way which would deprive or tend to deprive any individual of employment *opportunities.*" (Emphasis added.)

Relying on § 703(a)(2), *Griggs* explicitly focused on employment "practices, procedures, or tests," 401 U. S., at 430, that deny equal employment "opportunity," *id.*, at 431. We concluded that Title VII prohibits "procedures or testing mechanisms that operate as 'built-in headwinds' for minority

---

[9] In contrast, the language of § 703(a)(1), 42 U. S. C. § 2000e–2(a)(1), if it were the only protection given to employees and applicants under Title VII, might support petitioners' exclusive focus on the overall result. That subsection makes it an unlawful employment practice

"to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

groups." *Id.*, at 432. We found that Congress' primary purpose was the prophylactic one of achieving equality of employment "opportunities" and removing "barriers" to such equality. *Id.*, at 429–430. See *Albemarle Paper Co. v. Moody*, 422 U. S., at 417. The examination given to respondents in this case surely constituted such a practice and created such a barrier.

Our conclusion that § 703(a)(2) encompasses respondents' claim is reinforced by the terms of Congress' 1972 extension of the protections of Title VII to state and municipal employees. See n. 8, *supra.* Although Congress did not explicitly consider the viability of the defense offered by the state employer in this case, the 1972 amendments to Title VII do reflect Congress' intent to provide state and municipal employees with the protection that Title VII, as interpreted by *Griggs*, had provided to employees in the private sector: equality of *opportunity* and the elimination of discriminatory *barriers* to professional development. The Committee Reports and the floor debates stressed the need for equality of opportunity for minority applicants seeking to obtain governmental positions. *E. g.*, S. Rep. No. 92–415, p. 10 (1971); 118 Cong. Rec. 1815 (1972) (remarks of Sen. Williams). Congress voiced its concern about the widespread use by state and local governmental agencies of "invalid selection techniques" that had a discriminatory impact. S. Rep. No. 92–415, *supra,* at 10; H. R. Rep. No. 92–238, p. 17 (1971); 117 Cong. Rec. 31961 (1971) (remarks of Rep. Perkins).[10]

---

[10] The Committee Reports in both Houses, and Senator Williams, principal sponsor of the Senate bill that was ultimately enacted in large part, relied upon a report of the United States Commission on Civil Rights, which Senator Williams placed in the Congressional Record. See H. R. Rep. No. 92–238, p. 17 (1971); S. Rep. No. 92–415, p. 10 (1971); 118 Cong. Rec. 1815–1819 (1972). The Commission concluded that serious "[b]arriers to equal opportunity" existed for state and local government employees. Two of the three barriers cited were "recruitment and selection devices which are arbitrary, unrelated to job performance, and result in unequal

The decisions of this Court following *Griggs* also support respondents' claim. In considering claims of disparate impact under § 703(a)(2) this Court has consistently focused on employment and promotion requirements that create a discriminatory bar to *opportunities*. This Court has never read § 703(a)(2) as requiring the focus to be placed instead on the overall number of minority or female applicants actually hired or promoted. Thus *Dothard* v. *Rawlinson*, 433 U. S. 321 (1977), found that minimum statutory height and weight requirements for correctional counselors were the sort of arbitrary barrier to equal employment opportunity for women forbidden by Title VII. Although we noted in passing that women constituted 36.89 percent of the labor force and only 12.9 percent of correctional counselor positions, our focus was not on this "bottom line." We focused instead on the disparate effect that the minimum height and weight standards had on applicants: classifying far more women than men as ineligible for employment. *Id.*, at 329–330, and n. 12. Similarly, in *Albemarle Paper Co.* v. *Moody*, *supra*, the action was remanded to allow the employer to attempt to show that the tests that he had given to his employees for promotion were job related. We did not suggest that by promoting a sufficient number of the black employees who passed the examination, the employer could avoid this burden. See 422 U. S., at 436. See also *New York Transit Authority* v. *Beazer*, 440 U. S. 568, 584 (1979) ("A prima facie violation of the Act may be established by statistical evidence showing that an employment *practice* has the effect of denying members of one race equal access to employment *opportunities")* (emphasis added).

---

treatment of minorities," and promotions made on the basis of "criteria unrelated to job performance and on discriminatory supervisory ratings." U. S. Commission on Civil Rights, For All the People . . . By All the People—A Report on Equal Opportunity in State and Local Government Employment 119 (1969), reprinted in 118 Cong. Rec. 1817 (1972).

In short, the District Court's dismissal of respondents' claim cannot be supported on the basis that respondents failed to establish a prima facie case of employment discrimination under the terms of § 703(a)(2). The suggestion that disparate impact should be measured only at the bottom line ignores the fact that Title VII guarantees these individual respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria. Title VII strives to achieve equality of opportunity by rooting out "artificial, arbitrary, and unnecessary" employer-created barriers to professional development that have a discriminatory impact upon individuals. Therefore, respondents' rights under § 703(a)(2) have been violated, unless petitioners can demonstrate that the examination given was not an artificial, arbitrary, or unnecessary barrier, because it measured skills related to effective performance in the role of Welfare Eligibility Supervisor.

## B

The United States, in its brief as *amicus curiae*, apparently recognizes that respondents' claim in this case falls within the affirmative commands of Title VII. But it seeks to support the District Court's judgment in this case by relying on the defenses provided to the employer in § 703(h).[11] Section 703(h) provides in pertinent part:

> "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer . . . to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate be-

[11] The Government's brief is submitted by the Department of Justice, which shares responsibility for federal enforcement of Title VII with the Equal Employment Opportunity Commission (EEOC). The EEOC declined to join this brief. See Brief for United States as *Amicus Curiae* 1, and n.

cause of race, color, religion, sex or national origin." 78 Stat. 257, as amended, 42 U. S. C. § 2000e–2(h).

The Government argues that the test administered by the petitioners was not "used to discriminate" because it did not actually deprive disproportionate numbers of blacks of promotions. But the Government's reliance on § 703(h) as offering the employer some special haven for discriminatory tests is misplaced. We considered the relevance of this provision in *Griggs*. After examining the legislative history of § 703(h), we concluded that Congress, in adding § 703(h), intended only to make clear that tests that were *job related* would be permissible despite their disparate impact. 401 U. S., at 433–436. As the Court recently confirmed, § 703 (h), which was introduced as an amendment to Title VII on the Senate floor, "did not alter the meaning of Title VII, but 'merely clarifie[d] its present intent and effect.'" *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 73, n. 11 (1982), quoting 110 Cong. Rec. 12723 (1964) (remarks of Sen. Humphrey). A non-job-related test that has a disparate racial impact, and is used to "limit" or "classify" employees, is "used to discriminate" within the meaning of Title VII, whether or not it was "designed or intended" to have this effect and despite an employer's efforts to compensate for its discriminatory effect. See *Griggs*, 401 U. S., at 433.

In sum, respondents' claim of disparate impact from the examination, a pass-fail barrier to employment opportunity, states a prima facie case of employment discrimination under § 703(a)(2), despite their employer's nondiscriminatory "bottom line," and that "bottom line" is no defense to this prima facie case under § 703(h).

### III

Having determined that respondents' claim comes within the terms of Title VII, we must address the suggestion of petitioners and some *amici curiae* that we recognize an exception, either in the nature of an additional burden on plaintiffs

seeking to establish a prima facie case or in the nature of an affirmative defense, for cases in which an employer has compensated for a discriminatory pass-fail barrier by hiring or promoting a sufficient number of black employees to reach a nondiscriminatory "bottom line." We reject this suggestion, which is in essence nothing more than a request that we redefine the protections guaranteed by Title VII.[12]

Section 703(a)(2) prohibits practices that would deprive or tend to deprive *any individual* of employment opportunities." The principal focus of the statute is the protection of the individual employee, rather than the protection of the mi-

---

[12] Petitioners suggest that we should defer to the EEOC Guidelines in this regard. But there is nothing in the Guidelines to which we might defer that would aid petitioners in this case. The most support petitioners could conceivably muster from the Uniform Guidelines on Employee Selection Procedures, 29 CFR pt. 1607 (1981) (now issued jointly by the EEOC, the Office of Personnel Management, the Department of Labor, and the Department of Justice, see 29 CFR § 1607.1A (1981)), is *neutrality* on the question whether a discriminatory barrier that does not result in a discriminatory overall result constitutes a violation of Title VII. Section 1607.4C of the Guidelines, relied upon by petitioners, states that as a matter of "*administrative and prosecutorial discretion, in usual circumstances*," the agencies will not take enforcement action based upon the disparate impact of any component of a selection process if the total selection process results in no adverse impact. (Emphasis added.) The agencies made clear that the "guidelines do not address the underlying question of law," and that an individual "who is denied the job because of a particular component in a procedure which otherwise meets the 'bottom line' standard . . . retains the right to proceed through the appropriate agencies, and into Federal court." 43 Fed. Reg. 38291 (1978). See 29 CFR § 1607.16I (1981). In addition, in a publication entitled Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, the agencies stated:

"Since the [bottom-line] concept is not a rule of law, it does not affect the discharge by the EEOC of its statutory responsibilities to investigate charges of discrimination, render an administrative finding on its investigation, and engage in voluntary conciliation efforts. Similarly, with respect to the other issuing agencies, the bottom line concept applies not to the processing of individual charges, but to the initiation of enforcement action." 44 Fed. Reg. 12000 (1979).

nority group as a whole. Indeed, the entire statute and its legislative history are replete with references to protection for the individual employee. See, e. g., §§ 703(a)(1), (b), (c), 704(a), 78 Stat. 255–257, as amended, 42 U. S. C. §§ 2000e–2(a)(1), (b), (c), 2000e–3(a); 110 Cong. Rec. 7213 (1964) (interpretive memorandum of Sens. Clark and Case) ("discrimination is prohibited as to any individual"); id., at 8921 (remarks of Sen. Williams) ("Every man must be judged according to his ability. In that respect, all men are to have an equal opportunity to be considered for a particular job").

In suggesting that the "bottom line" may be a defense to a claim of discrimination against an individual employee, petitioners and *amici* appear to confuse unlawful discrimination with discriminatory intent. The Court has stated that a nondiscriminatory "bottom line" and an employer's good-faith efforts to achieve a nondiscriminatory work force, might in some cases assist an employer in rebutting the inference that particular action had been intentionally discriminatory: "Proof that [a] work force was racially balanced or that it contained a disproportionately high percentage of minority employees is not wholly irrelevant on the issue of intent when that issue is yet to be decided." *Furnco Construction Corp.* v. *Waters*, 438 U. S. 567, 580 (1978). See also *Teamsters* v. *United States*, 431 U. S. 324, 340, n. 20 (1977). But resolution of the factual question of intent is not what is at issue in this case. Rather, petitioners seek simply to justify discrimination against respondents on the basis of their favorable treatment of other members of respondents' racial group. Under Title VII, "[a] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination." *Furnco Construction Corp.* v. *Waters*, 438 U. S., at 579.

> "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race, without regard to whether

members of the applicant's race are already proportionately represented in the work force. See *Griggs* v. *Duke Power Co.*, 401 U. S., at 430; *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273, 279 (1976)." *Ibid.* (emphasis in original).

It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group. We recognized in *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702 (1978), that fairness to the class of women employees as a whole could not justify unfairness to the individual female employee because the "statute's focus on the individual is unambiguous." *Id.*, at 708. Similarly, in *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542 (1971) *(per curiam)*, we recognized that a rule barring employment of all married *women* with preschool children, if not a bona fide occupational qualification under § 703(e), violated Title VII, even though female applicants without preschool children were hired in sufficient numbers that they constituted 75 to 80 percent of the persons employed in the position plaintiff sought.

Petitioners point out that *Furnco, Manhart,* and *Phillips* involved facially discriminatory policies, while the claim in the instant case is one of discrimination from a facially neutral policy. The fact remains, however, that irrespective of the form taken by the discriminatory practice, an employer's treatment of other members of the plaintiffs' group can be "of little comfort to the victims of . . . discrimination." *Teamsters* v. *United States, supra,* at 342. Title VII does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons of his or her race or sex were hired. That answer is no more satisfactory when it is given to victims of a policy that is facially neutral but practically discriminatory. Every *individual* employee is protected against both discriminatory treatment

and "practices that are fair in form, but discriminatory in operation." *Griggs* v. *Duke Power Co.*, 401 U. S., at 431. Requirements and tests that have a discriminatory impact are merely some of the more subtle, but also the more pervasive, of the "practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp.* v. *Green*, 411 U. S., at 800.

## IV

In sum, petitioners' nondiscriminatory "bottom line" is no answer, under the terms of Title VII, to respondents' prima facie claim of employment discrimination. Accordingly, the judgment of the Court of Appeals for the Second Circuit is affirmed, and this case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

In past decisions, this Court has been sensitive to the critical difference between cases proving discrimination under Title VII, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV), by a showing of disparate treatment or discriminatory intent and those proving such discrimination by a showing of disparate impact. Because today's decision blurs that distinction and results in a holding inconsistent with the very nature of disparate-impact claims, I dissent.

## I

Section 703(a)(2) of Title VII, 42 U. S. C. § 2000e–2(a)(2), provides that it is an unlawful employment practice for an employer to

> "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or

> otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

Although this language suggests that discrimination occurs only on an individual basis, in *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 432 (1971), the Court held that discriminatory intent on the part of the employer against an individual need not be shown when "employment procedures or testing mechanisms . . . operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." Thus, the Court held that the "disparate impact" of an employer's practices on a racial group can violate § 703(a)(2) of Title VII. In *Griggs* and each subsequent disparate-impact case, however, the Court has considered, not whether the claimant as an individual had been classified in a manner impermissible under § 703(a)(2), but whether an employer's procedures have had an adverse impact on the protected *group* to which the individual belongs.

Thus, while disparate-*treatment* cases focus on the way in which an individual has been treated, disparate-*impact* cases are concerned with the protected group. This key distinction was explained in *Furnco Construction Corp.* v. *Waters*, 438 U. S. 567, 581–582 (1978) (MARSHALL, J., concurring in part):

> "It is well established under Title VII that claims of employment discrimination because of race may arise in two different ways. *Teamsters* v. *United States*, 431 U. S. 324, 335–336, n. 15 (1977). An individual may allege that he has been subjected to 'disparate treatment' because of his race, or that he has been the victim of a facially neutral practice having a 'disparate impact' on his racial group."[1]

---

[1] See also *Teamsters* v. *United States*, 431 U. S. 324, 335–336, n. 15 (1977) (similar explanation).

In keeping with this distinction, our disparate-impact cases consistently have considered whether the result of an employer's *total selection process* had an adverse impact upon the protected group.[2]   If this case were decided by reference to the total process—as our cases suggest that it should be—the result would be clear.   Here 22.9% of the blacks who entered the selection process were ultimately promoted, compared with only 13.5% of the whites.   To say that this selection process had an unfavorable "disparate impact" on blacks is to ignore reality.

The Court, disregarding the distinction drawn by our cases, repeatedly asserts that Title VII was designed to protect individual, not group, rights.   It emphasizes that some individual blacks were eliminated by the disparate impact of the preliminary test.   But this argument confuses the *aim* of Title VII with the legal theories through which its aims were intended to be vindicated.   It is true that the aim of Title VII is to protect individuals, not groups.   But in advancing this commendable objective, Title VII jurisprudence has recognized two distinct methods of proof.   In one set of cases—those involving direct proof of discriminatory intent—the plaintiff seeks to establish direct, intentional discrimination against him.   In that type of case, the individual is at the forefront throughout the entire presentation of evidence.   In disparate-impact cases, by contrast, the plaintiff seeks to carry his burden of proof by way of *inference*—by showing that an employer's selection process results in the rejection of a disproportionate number of members of a protected group

---

[2] See *Dothard* v. *Rawlinson*, 433 U. S. 321, 329 (1977) (statutory height and weight requirements operated as a bar to *employment* of disproportionate number of women); *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 409–411 (1975) (seniority system allegedly locked blacks into lower paying jobs; applicants to skilled lines of progression were required to pass two tests); *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431 (1971) (tests were an absolute bar to transfers or hiring; the Court observed that all Congress requires is "the removal of artificial, arbitrary, and unnecessary barriers to *employment* . . .") (emphasis added).

to which he belongs. From such a showing a fair inference then may be drawn that the rejected applicant, as a member of that disproportionately excluded group, was himself a victim of that process' "'built-in headwinds.'" *Griggs, supra,* at 432. But this method of proof—which actually *defines* disparate-impact theory under Title VII—invites the plaintiff to prove discrimination by reference to the group rather than to the allegedly affected individual.[3] There can be no violation of Title VII on the basis of disparate impact in the absence of disparate impact on a *group.*[4]

In this case respondent black employees seek to benefit from a conflation of "discriminatory treatment" and "disparate impact" theories. But they cannot have it both ways. Having undertaken to prove discrimination by reference to one set of group figures (used at a preliminary point in the selection process), these respondents then claim that *nondis-crimination* cannot be proved by viewing the impact of the entire process on the group as a whole. The fallacy of this reasoning—accepted by the Court—is transparent. It is to

---

[3] Initially, the plaintiff bears the burden of establishing a prima facie case that Title VII has been infringed. See *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248, 252–253 (1981). In a disparate-impact case, this burden is met by showing that an employer's selection process results in the rejection of a disproportionate number of members of a protected group. See *Teamsters* v. *United States, supra,* at 336–338. Regardless of whether the plaintiff's prima facie case must itself focus on the defendant's overall selection process or whether it is sufficient that the plaintiff establish that at least one pass-fail barrier has resulted in disparate impact, the employer's presentation of evidence showing that its overall selection procedure does not operate in a discriminatory fashion certainly dispels any inference of discrimination. In such instances, at the close of the evidence, the plaintiff has failed to show disparate impact by a preponderance of the evidence.

[4] The Equal Employment Opportunity Commission and other federal enforcement agencies have adopted the "bottom-line" principle—*i. e.,* the process viewed as a whole—in deciding when to bring an action against an employer. See Uniform Guidelines on Employee Selection Procedures, 5 CFR § 300.103(c) (1981).

confuse the individualistic *aim* of Title VII with the methods of proof by which Title VII rights may be vindicated. The respondents, as individuals, are entitled to the full personal protection of Title VII. But, having undertaken to prove a violation of their rights by reference to group figures, respondents cannot deny petitioners the opportunity to rebut their evidence by introducing figures of the same kind. Having pleaded a disparate-impact case, the plaintiff cannot deny the defendant the opportunity to show that there was no disparate impact. As the Court of Appeals for the Third Circuit noted in *EEOC* v. *Greyhound Lines, Inc.*, 635 F. 2d 188, 192 (1980):

> "[N]o violation of Title VII can be grounded on the disparate impact theory without proof that the questioned policy or practice has had a disproportionate impact on the employer's workforce. This conclusion should be as obvious as it is tautological: there can be no disparate impact unless there is [an ultimate] disparate impact."

Where, under a facially neutral employment process, there has been no adverse effect on the group—and certainly there has been none here—Title VII has not been infringed.

## II

The Court's position is no stronger in case authority than it is in logic. None of the cases relied upon by the Court controls the outcome of this case.[5] Indeed, the disparate-

---

[5] The Court concentrates on cases of questionable relevance. Most of the lower courts that have squarely considered the question have concluded that there can be no violation of Title VII on a disparate-impact basis when there is no disparate impact at the *bottom line*. See, *e. g.*, *EEOC* v. *Greyhound Lines, Inc.*, 635 F. 2d 188 (CA3 1980); *EEOC* v. *Navajo Refining Co.*, 593 F. 2d 988 (CA10 1979); *Friend* v. *Leidinger*, 588 F. 2d 61, 66 (CA4 1978); *Rule* v. *International Assn. of Ironworkers*, 568 F. 2d 558 (CA8 1977); *Smith* v. *Troyan*, 520 F. 2d 492, 497–498 (CA6 1975), cert. denied, 426 U. S. 934 (1976); *Williams* v. *City & County of San Francisco*, 483 F. Supp. 335 (ND Cal. 1979); *Brown* v. *New Haven Civil Service*

impact cases do not even support the propositions for which they are cited. For example, the Court cites *Dothard* v. *Rawlinson*, 433 U. S. 321 (1977) (holding impermissible minimum statutory height and weight requirements for correctional counselors), and observes that "[a]lthough we noted in passing that women constituted 36.89 percent of the labor force and only 12.9 percent of correctional counselor positions, our focus was not on this 'bottom line.' We focused instead on the disparate effect that the minimum height and weight standards had on applicants: classifying far more women than men as ineligible for employment." *Ante*, at 450. In *Dothard*, however, the Court was not considering a case in which there was any difference between the discriminatory effect of the employment standard and the number of minority members actually hired. The *Dothard* Court itself stated:

> "[T]o establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question *select* applicants *for hire* in a discriminatory pattern. Once it is shown that *the employment standards* are discriminatory in effect, the employer must meet 'the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question.'" 433 U. S., at 329 (emphasis added).

The *Dothard* Court did not decide today's case. It addressed only a case in which the challenged standards had a discriminatory impact at the bottom line—the hiring decision. And the *Dothard* Court's "focus," referred to by the Court, is of no help in deciding the instant case.[6]

---

*Board*, 474 F. Supp. 1256 (Conn. 1979); *Lee* v. *City of Richmond*, 456 F. Supp. 756 (ED Va. 1978).

[6] The Court cites language from two other disparate-impact cases. The Court notes that in *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405 (1975), the Court "remanded to allow the employer to attempt to show that the tests . . . given . . . for promotion were job related." *Ante*, at 450. But the fact that the Court did so without suggesting "that by promoting a suf-

The Court concedes that the other major cases on which it relies, *Furnco, Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702 (1978), and *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542 (1971) *(per curiam)* "involved facially discriminatory policies, while the claim in the instant case is one of discrimination from a facially neutral policy." *Ante*, at 455. The Court nevertheless applies the principles derived from those cases to the case at bar. It does so by reiterating the view that Title VII protects *individuals*, not *groups*, and therefore that the manner in which an employer has treated other members of a group cannot defeat the claim of an individual who has suffered as a result of even a facially neutral policy. As appealing as this sounds, it confuses the distinction—uniformly recognized until today—between disparate *impact* and disparate *treatment*. See *supra*, at 457–458. Our cases, cited above, have made clear that discriminatory-impact claims cannot be based on how an individual is treated in isolation from the treatment of other members of the group. Such claims necessarily are based on whether the group fares less well than other groups under a policy, practice, or test. Indeed, if only one minority member has

---

ficient number of black employees who passed the examination, the employer could avoid this burden," *ibid.*, can hardly be precedent for the negative of that proposition when the issue was neither presented in the facts of the case nor addressed by the Court.

Similarly, *New York Transit Authority* v. *Beazer*, 440 U. S. 568 (1979), provides little support despite the language quoted by the Court. See *ante*, at 450, quoting 440 U. S., at 584 (" 'A prima facie violation of the Act may be established by statistical evidence showing that an employment *practice* has the effect of denying members of one race equal access to employment *opportunities*' ") (emphasis added by the Court). In *Beazer*, the Court ruled that the statistical evidence actually presented was insufficient to establish a prima facie case of discrimination, and in doing so it indicated that it would have found statistical evidence of the number of applicants *and* employees in a methadone program quite probative. See *id.*, at 585. *Beazer* therefore does not justify the Court's speculation that the number of blacks and Hispanics actually employed were irrelevant to whether a case of disparate impact had been established under Title VII.

taken a test, a disparate-impact claim cannot be made, regardless of whether the test is an initial step in the selection process or one of several factors considered by the employer in making an employment decision.[7]

## III

Today's decision takes a long and unhappy step in the direction of confusion. Title VII does not require that employers adopt merit hiring or the procedures most likely to permit the greatest number of minority members to be considered for or to qualify for jobs and promotions. See *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248, 258–259 (1981); *Furnco,* 438 U. S., at 578. Employers need not develop tests that accurately reflect the skills of every individual candidate; there are few if any tests that do so. Yet the Court seems unaware of this practical reality, and perhaps oblivious to the likely consequences of its decision. By its holding today, the Court may force employers either to eliminate tests or rely on expensive, job-related, testing procedures, the validity of which may or may not be sustained if challenged. For state and local governmental employers with limited funds, the practical effect of today's decision may well be the adoption of simple quota hiring.[8] This arbi-

---

[7] Courts have recognized that the probative value of statistical evidence varies with sample size in disparate-impact cases. See, *e. g., Teamsters* v. *United States,* 431 U. S., at 340, n. 20 ("Considerations such as small sample size may, of course, detract from the value of such evidence . . ."); *Mayor of Philadelphia* v. *Educational Equality League,* 415 U. S. 605, 621 (1974) ("[T]he District Court's concern for the smallness of the sample presented by the 13-member Panel was . . . well founded"); *Rogillio* v. *Diamond Shamrock Chemical Co.,* 446 F. Supp. 423, 427–428 (SD Tex. 1978) (sample of 10 too small); *Dendy* v. *Washington Hospital Center,* 431 F. Supp. 873, 876 (DC 1977) (sample must be "large enough to mirror the reality of the employment situation"). A sample of only one would have far too little probative value to establish a prima facie case of disparate impact.

[8] Another possibility is that employers may integrate consideration of test results into one overall hiring decision based on that "factor" *and* addi-

trary method of employment is itself unfair to individual applicants, whether or not they are members of minority groups. And it is not likely to produce a competent work force. Moreover, the Court's decision actually may result in employers employing *fewer* minority members. As Judge Newman noted in *Brown* v. *New Haven Civil Service Board*, 474 F. Supp. 1256, 1263 (Conn. 1979):

> "[A]s private parties are permitted under Title VII itself to adopt voluntary affirmative action plans, . . . Title VII should not be construed to prohibit a municipality's using a hiring process that results in a percentage of minority policemen approximating their percentage of the local population, instead of relying on the expectation that a validated job-related testing procedure will produce an equivalent result, yet with the risk that it might lead to substantially less minority hiring."

Finding today's decision unfortunate in both its analytical approach and its likely consequences, I dissent.

---

tional factors. Such a process would *not*, even under the Court's reasoning, result in a finding of discrimination on the basis of disparate impact unless the actual hiring decisions had a disparate impact on the minority group. But if employers integrate test results into a single-step decision, they will be free to select *only* the number of minority candidates proportional to their representation in the work force. If petitioners had used this approach, they would have been able to hire substantially fewer blacks without liability on the basis of disparate impact. The Court hardly could have intended to encourage this.