Gail BURNEY, Plaintiff,

v.

CITY OF PAWTUCKET, Rhode Island Municipal Police Academy, Raymond J. Shannon, Glenford Shibley, and William Tocco, Defendants.

Civ. A. No. 82–0817 S.

United States District Court,
D. Rhode Island.

April. 26, 1983.

Roney & Labinger by Lynette Labinger, Providence, R.I., for plaintiff.

Spencer Viner, Jr., City Sol., Pawtucket, R.I., for City of Pawtucket.

Dennis J. Roberts II, Atty. Gen., Donald G. Elbert, Sp. Asst. Atty. Gen., Providence, R.I., for remaining defendants.

## OPINION

SELYA, District Judge.

This is the second federal court installment in the serialized account of Gail Burney's efforts to become a uniformed police officer. Her action for declaratory and injunctive relief and for damages was commenced on December 29, 1982. The first five counts of the amended complaint alleged that defendants, the City of Pawtucket ("Pawtucket"), the Rhode Island Municipal Police Academy ("Academy"), and three officials of the Academy discriminated against the plaintiff on the basis of her sex in violation of Title VII, 42 U.S.C. § 2000e et seq., as amended ("Title VII"), 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; denied her due process of law in violation of 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth

Amendment to the United States Constitution; and denied her rights under Rhode Island law. The facts described in the amended complaint focussed on the physical training program and demerit system instituted by the Academy and the plaintiff's consequent loss of employment with Pawtucket due to her alleged failure to meet the requirements of that program.

Following extensive hearings and a trial on the merits, the Court, in an opinion dated March 9, 1983, *Burney v. City of Pawtucket*, 559 F.Supp. 1089, (*"Burney I"*), granted injunctive relief reinstating the plaintiff as a cadet at the Academy[1], and striking down key aspects of the physical training program and of the demerit system.[2]

The salient facts to that point are described at length in *Burney I*, at 1091–97, and repetition thereof would be pleonastic. Suffice it to say that the difficulties between the plaintiff and the defendants were not ended by the decision in *Burney I*, for plaintiff subsequently failed the Academy's self-defense course. This discipline had not been in issue during the litigation in *Burney I*. The defendants promptly moved to vacate or modify the outstanding restraining order so as to permit them again to dismiss Burney from the Academy.[3] The plaintiff, in turn, moved to supplement her amended complaint by adding thereto a sixth count alleging in substance that the defendants violated Title VII by including the self-defense course in a recruit's overall academic average and by requiring a passing grade therein as a prerequisite for graduation. Plaintiff also sought further injunctive relief.[4] These proceed-

---

**1.** Plaintiff had continued her training pursuant to a temporary restraining order granted on December 29, 1982.

**2.** Judgment was entered on March 16, 1983. The defendants have claimed an appeal to the First Circuit, which is presently pending. No stay of the *Burney I* mandate has, however, been issued.

**3.** Defendants' motion was filed virtually simultaneous with the announcement of the Court's opinion in *Burney I*, and prior to the actual

entry of the permanent injunction mandated thereby. Thus, defendants' motion to modify was addressed technically to the December 29, 1982 temporary restraining order. *See* note 1, *ante.*

**4.** Plaintiff likewise challenged the Academy's aquatic safety program at this juncture. It subsequently appeared, however, that plaintiff's problems with that course were due in part to her inability to log the requisite number of hours because of injury, and the parties have since resolved their water-based differences by

ings were time-critical, as the plaintiff's class was scheduled to graduate from the Academy on March 25, 1983, and graduation had distinct and meaningful implications as to plaintiff's subsequent seniority and other valuable rights.

The Court held a hearing on these matters on March 21, 1983, following which the Court granted the motion to supplement the amended complaint; temporarily restrained the defendants from discharging the plaintiff for failure to achieve a passing score on the self-defense test; and further ordered that the plaintiff be provisionally graduated with her class, and that her prospective badge number and seniority rights be preserved. *Burney v. City of Pawtucket,* C.A. No. 82–0817S (March 22, 1983), slip opinion at 4–5 ("*Burney II*"). The Court specifically directed, however, "that plaintiff, while she is provisionally to be graduated, shall not be placed upon active duty in the Pawtucket police force for the time being." *Id.* at 5. A hearing on preliminary injunction was set for March 31, 1983.[5] By agreement of the parties, and with the approval of the Court, the hearing was thereafter postponed to facilitate discovery, and was held on April 15, 1983. Following the trial, decision was reserved. This opinion constitutes the Court's findings of fact and conclusions of law thereon in pursuance of Rules 52(a) and 65, Fed.R.Civ.P.

The findings of fact made in *Burney I,* to the extent relevant here, are reaffirmed. Incremental facts as found by the Court are susceptible to succinct summarization. The Academy's self-defense course, as presently structured, evolved some five years ago when defendant Shannon became executive director of the Academy. It has been, and still is, taught by Nancy Cerio. Cerio has approximately a dozen years of teaching experience in the martial arts, and has taught the course at the Academy—in addition to her tutorial duties elsewhere—since its inception. Cerio possesses a fifth degree black belt, and is well-qualified in her field.

The course itself comprises twenty-six hours of instruction in a variety of techniques, including control of a suspect; disarming of a suspect; night-stick (or baton) techniques; and handgun retention. While the techniques are derived from the martial arts, and appear to stress jujitsu movements (interlaced with a smattering of judo and karate), they are really an empirical polyglot constructed by Cerio from her knowledge of, and experience in, the martial arts generally; from her independent studies of police work; and from Shannon's input based on his thirty years of service in law enforcement. Subsequent to completion of the course, Cerio grades each cadet on the twenty different techniques which collectively comprise the Academy's self-defense kreigspiel. A point scale of "1" to "5" is used for each maneuver,[6] as follows:

"5"—excellent
"4"—good
"3"—fair
"2"—weak
"1"—poor

Cerio's grading is largely subjective,[7] bottomed on factors such as "motivation", "technique", and "number of mistakes made". One hundred points would be a perfect score (i.e., 5 points per move for each of the 20 routines). A grade of 70 was assigned as an omnibus passing grade, presumably because this was the pass/fail benchmark for all numerically-graded Academy courses. Cerio was not consulted

---

stipulation. Thus, aquatic instruction is not now *sub judice.*

5. The parties stipulated that trial on the merits as to Count VI would be merged with the hearing on preliminary injunction. *See* Rule 65(a)(2), Fed.R.Civ.P.

6. Cerio testified that it was possible to get a zero grade, which she equated to meaning that a recruit would have been killed had he or she performed the maneuver in question on the street in the same manner as on the test. Her exact definition of a "0" grade: "You are dead."

7. While subjective in nature, there is no proof that Cerio graded women differently than men, or that she exhibited any animus in her treatment of plaintiff. The Court finds as a fact that Cerio graded in a gender-neutral manner, and that she dealt fairly with Burney.

as to the selection of the pass/fail criterion for the course. The self-defense regimen was not validated in any professionally-acceptable manner; nor was the pass/fail standard.[8] Cerio's practice has been that, if a pupil failed the test, he .or she would be entitled to a second chance by way of a re-test. The re-test would be scored in the same fashion. The Court received from Cerio and an assistant a blow-by-blow demonstration of the maneuvers in question, and also had the benefit of more truncated exhibitions from various other expert witnesses.

It is crystal clear that the limited amount of instruction involved is manifestly insufficient to develop actual proficiency in self-defense skills. All of the experts concur on this point (if on little else). Rather, the course is designed, in Cerio's words, to assess "reactions under pressure", and to inculcate a basic understanding of techniques which an officer can use as a foundation in perfecting his or her skills on the job, given continued practice.

During the past five years, several hundred cadets, including twenty-six women, have undergone self-defense training at the Academy. Only Burney and a single male cadet have failed to pass.[9] In the class of 1983–I (wherein the plaintiff was the lone woman), four recruits initially flunked the self-defense course. All four were re-tested in accordance with Cerio's wonted practice. *See* text *ante.* The plaintiff failed the re-test as well. An analysis of her test scores is intriguing, as she showed little consistency in performance from one test to the other. She did well on certain moves in her original evaluation, but did poorly in many of those same routines on the re-test. The reverse was equally true. This spotty report card stands, by and large, in sharp contradistinction to the other cadets who were re-tested, where a pattern of consistent performance emerged on an item-by-item perscrutation. Cerio, when asked to opine as to the reasons underlying plaintiff's inability to pass either the test or the re-test, ascribed Burney's flummoxes principally to lack of motivation and secondarily to (i) poor balance, (ii) lack of fluidity of motion, and (iii) inadequate recovery.[10] The inconsistencies which are reflected within Burney's test and re-test results certainly lend credence to Cerio's explanation that part of her problem was motivational.[11]

**8.** This lack of validation was a paramount consideration in the Court's assessment of likelihood of success, for purposes of the March 22d temporary restraining order. *See Burney II* at 3. ·

**9.** It would, however, be overly simplistic to attach conclusive weight to these figures. Not only are they short of the level of statistical significance given the sample size, but the sample itself is skewed. The test was administered only to women who reached the final stages of the Academy curriculum; and, as noted in *Burney I,* the Pre-Test, that is, the physical agility test by which recruits have been screened for entrance into the Academy, operated so as to discriminate against, and exclude, female applicants at entry level. *E.g., id.* at 1098–99. Thus, only those women who survived the Pre-Test would be included within the sample population.

Similarly, plaintiff's argument that great weight should be accorded to a difference in grades between men and women in self-defense instruction at the Academy overlooks that the sample size involved in these figures (which emanate from Exhibit 6 to the deposition of Ronald Clare) is miniscule (7 women in all), and inherently unreliable. The slightly larger sample (17 women) projected in Plaintiff's Post-Trial Memorandum (Count VI), is likewise inconclusive, given both the meagre spread and the *ad hoc* method of calculation employed by plaintiff's counsel. It is interesting to note that the differences between the average grade for men in self-defense (81.3) and the average grade for the seventeen women (77.1) fails to meet the "eighty per cent rule" suggested by the EEOC as a measurement for evidence of adverse impact, see *Burney I, supra* n. 14; 29 C.F.R. § 1607.4D.

**10.** Since Cerio equated "recovery" with the ability to take corrective action following a mis-step, and faulted the plaintiff for giving up once something went awry, this might very well be considered a sub-set of Burney's perceived motivational deficiencies.

**11.** The Court questioned Cerio closely on her hand-written notes which comprised part of her grading of Burney's tests, especially since one such note, *see* Exhibit A, could be interpreted as tracing Burney's failure in part to lack of upper body strength. Cerio, in her second appearance on the witness stand, explained this reference to the Court's satisfac-

The Court, as mentioned in *Burney II,* was impressed by Cerio's testimony, *id.* at 2, and credits it on this and other matters.

The law governing this case has heretofore been set forth at some length in *Burney I,* and need only be reviewed at this juncture in summary fashion. "To establish a prima facie case of discrimination, plaintiff must show that the facially neutral employment practices which she challenges have a significantly discriminatory impact." *Burney I* at 1098, citing *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982). The First Circuit has lucidly encapsulated the rationale of *Teal* as to this point, in the following language:

> Teal teaches that the proper place to evaluate the strength of a Title VII plaintiff's prima facie case of disparate impact discrimination is the point at which the employer's neutral criterion has a discriminatory effect. The Court's focus must be on the first step in the employment process that produces an adverse impact on a group protected by Title VII, not the end result of the employment process as a whole. When it is shown that an employer's rule disproportionately affects members of a class protected by Title VII, eliminating them from competition for an employment opportunity, the plaintiff establishes a prima facie case.

*Costa v. Markey,* 706 F.2d 1, 4 (1st Cir. 1982), *petition for cert. filed,* 51 U.S.L.W. 3741 (U.S. Mar. 3, 1983) (No. 82–1506).

The Court's attention must initially focus, therefore, on whether the plaintiff, vis-a-vis the self-defense course, has proven that these requirements as a whole have a disproportionate adverse impact on women. *Connecticut v. Teal, supra; Costa v. Markey, supra; Boston Chapter N.A.A.C.P., Inc. v. Beecher,* 504 F.2d 1017, 1021 (1st Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Burney I, supra.*

In assessing this question, the defendants' reliance on the fact that all of the women, save Burney, who have been subjected to the self-defense course since its revamping in 1978 have passed is not dispositive. Not only does this argument suffer from the frailties hereinbefore indicated, *see* note 9, *ante,* but the notion that this sort of bottom line analysis is issue-determinative has been discredited by a series of recent court decisions. *E.g., Connecticut v. Teal, Costa v. Markey,* and *Burney I,* all *supra.* The Court must look to whether the self-defense regimen, and the concomitant use of a failing grade as a knock-out factor by the Academy, represents an artificial, arbitrary and unnecessary employer-created barrier which denies to females the opportunity to compete equally and on an even footing with males.

Plaintiff first endeavors to boot-strap from the Court's interdiction of the physical agility requirements in *Burney I* by contending that, since the Academy carries the self-defense course within the physical education block grade, it is merely another variant of that which has been found wanting by Title VII standards. This argument is pure sophistry. Howsoever categorized, the self-defense curriculum was not before the Court in *Burney I* (a fact conceded by plaintiff by necessary implication in deeming it necessary to supplement her complaint to extend to this course of study). It is separate and distinct from the physical training program and demerit system; it undeniably appears, on its face, "to have a greater relationship to the job functions of a police officer than the Academy's physical agility requirements", *Burney II* at 2; and it must stand or fall on its own merits (or lack thereof). Self-defense, as practiced at the Academy, may be rose or thorn; but it cannot, without more, be mowed down merely because the defendants have, as a matter of in-house paper shuffling, catalogued it within the very same garden

---

tion. Since Burney did not have the techniques mastered, she would have had to resort to aggressiveness and upper body strength. The Court accepts Cerio's direct and unequivocal

answer that, had the plaintiff possessed greater strength, it would not in any way have affected her examination results.

where the weed of a now-discredited program also grew.

The plaintiff attempts to make out her prima facie case on Count VI principally through the testimony of a pair of expert witnesses, George Pesare and Linda Jean Herzog. Pesare's affidavit is of record (Exhibit 36), and Pesare supplemented this affidavit by live testimony at the April 15th hearing. Pesare is a black belt of the ninth grade,[12] and has extensive instructional experience in the martial arts. In the proverbial nutshell, he contends that size and strength are relevant to the ability to perform the self-defense techniques at issue; that beginners, in particular, can and do use sheer muscle to compensate for lack of skill; that women as a group cannot match the performance of men as a group in the martial arts; that it takes women longer, on average, to attain proficiency in these techniques; that women must be taught separately and differently from men;[13] and that the innate lack of physical aggressiveness which he perceives to be characteristic of women as a class tends further to handicap females in assimilating such training. He professes that raw body strength is itself a distinct asset in mastering the techniques.

Herzog, a protege of Pesare's who now serves as a member of the uniformed division of the U.S. Secret Service, testified by deposition. Although she is a fourth degree black belt, her credentials are of a considerably lesser order than the other experts who testified.[14] Her conclusions were generally of a piece with those of her mentor.

There can be little doubt but that, if these views are accepted, disparate impact would be shown. It requires no citation of authority to conclude that men, on average, are taller, heavier and physically stronger than women.[15]

The defendants, however, have met these arguments head-on. The defendants' lead expert was Chuck Merriman, a member of the "Black Belt Hall of Fame", holder of black belts in both karate (sixth degree) and judo (second degree), and an internationally-renowned competitor, lecturer and savant in the martial arts. Merriman was head-and-shoulders above the pack in terms of knowledge and expertise. He stated unequivocally that size and strength are not significant in the martial arts generally,[16] and are at most "nominal" factors in the Academy's program; that raw physical strength may well be a detriment in mastering these techniques; and that training for women is the same as for men.[17] When queried as to the factors which, in his opinion, lead to success in a self-defense class setting such as the Academy's, Merriman responded as follows:

"First of all, probably decisiveness, the decision to do something, speed, balance, technique, attitude, direction of force, leverage, these are all major factors, and in most cases strength ... can be detrimental to the technique more than help."

---

12. There is some reason to believe, however, that Pesare passed through many of the advanced black belt degrees by self-propulsion.

13. At the Academy, the self-defense course is taught on a coeducational basis.

14. The plaintiff moved during the deposition that the Court recognize Herzog as an expert witness. Herzog Deposition at 19. The Court does so.

15. In any event, plaintiff has so proven here by unrefuted statistical evidence. *See* Exhibit 34. And, the record in *Burney I* (which remains before the Court as part of this proceeding) is replete with proof that women, as a group, are inferior to men in regard not only to overall measures of strength and endurance, but in such specific areas as aerobic capacity and upper body strength.

16. Those attributes are, in Merriman's words, "of minimal consequence." Such a perspective has been given currency in certain circles for centuries. In the *Panchatantra*, a collection of apologues in the original Sanskrit, a Tibetan folktale is found wherein that epitome of animal strength, the King of Beasts, falls victim to the wiles of so feeble a creature as the hare (gender uncertain). *But see* Aesop's Fables, *The Lion's Share* (wherein the protagonist subdues less powerful animals not only by the exercise of leonine strength, but by wit and guile).

17. Merriman, in fact, frequently taught co-ed classes.

Merriman further observed that, in his experience, attainment in the martial arts was equally accessible to both sexes.

Cerio's testimony was along the same lines. She specifically stated that students of the martial arts are often aided rather than hindered by lack of upper body strength (as more powerful individuals are more inclined to rely on brute force as opposed to the techniques themselves); that women, in her experience, are better coordinated than men and can absorb the techniques with greater facility; [18] and that, in her judgment, spirit, balance, fluidity, movement, body management, quickness and flexibility were the salient ingredients for success in the course.[19]

The lines are drawn razor-sharp between the plaintiff's experts, on the one hand, and the defense experts, on the other hand. The Court had no hesitancy in giving credence to the opinions of Merriman and Cerio in this battle of the initiates. Not only were they generally more impressive as witnesses schooled in their specialized field, but their testimony was more attuned to the actuality of the situation. Cerio, as the architect of the course, had a unique vantage point; her description of the program stressed familiarity with technique and attention to form. She appeared to the Court to be, in Merriman's phrase, primarily concerned with "making the kata come alive". The course was intended not to manufacture instant black belts, but merely to impart a basic understanding of the techniques as a foundation upon which recruits could build during active police service, and to test reactions under pressure. Size and strength were, in this setting, irrelevant.

Given an understanding of the goals of the program, the opinions of the gurus are not as widely divergent as might initially appear. Herzog admitted that, in acquiring martial arts training, good physical conditioning, comprehension and learning of the techniques, mental attitude, balance, breathing and practice are important factors. Herzog Deposition at 63–64. Pesare's affidavit described the techniques as involving "leverage and quickness". Pesare Affidavit ¶ 15. Pesare, under questioning by the Court, acknowledged that balance, fluidity of motion, motivation, understanding and comprehension were all key ingredients in the learning process; and that, in his experience, these factors were gender-neutral. The Court is persuaded that the cadets who took Cerio's course were graded on form and technique, not on actual combat proficiency; and that men and women were on an equal footing in this endeavor.[20]

One of the difficulties with the evidence given both by Pesare and by Herzog was a seeming inability to grasp the essence of what Cerio sought to accomplish at the Academy. Her course was a celebration of form, technique, and style. To the contrary, both Pesare and Herzog focussed on combat and competition. *See, e.g.,* Pesare Affidavit ¶¶ 15, 16, 18; Herzog Deposition at 12, 19–20. The Academy's self-defense curriculum did not attempt to measure prowess in battle, but only to inculcate and to gauge technical mastery of methodology and discipline of approach. It did so, in the Court's judgment, in a non-discriminatory manner.

The probative evidence in the case at bar wholly fails to prove that the required course in self-defense, or any of its accoutrements, as conducted and administered at

**18.** Cerio described women as more receptive than men to learning arcane methods of self-defense, as they had fewer preconceptions as to how to defend themselves. In this vein, Cerio portrayed the prototypical female novice as "an empty cup", not encumbered by the dregs of brawls gone by.

**19.** Burney, by affidavit, asserts that Cerio told plaintiff that her weight was insufficient to permit her to achieve "control". Burney Affidavit ¶ 9 (Exhibit 35). Burney did not testify.

Cerio did not admit to making this remark (which runs counter to the entire tenor of her testimony). The Court does not credit ¶ 9 of the said affidavit.

**20.** The Court is convinced that the touchstone of success in the self-defense course was an appreciation of, and conscientious adherence to, Merriman's axiom that "the mind and the fist are the same".

the Academy, has a disproportionate adverse impact upon women, or that it unfairly denies to women opportunity or access, or that the employment practices challenged by Count VI have a significantly discriminatory impact. Nor can any serious question be raised, on this record, as to disparate administration of a gender-neutral employment practice.[21]

This being so, plaintiff has failed to make out her prima facie case; and the Court need go no further.[22]

Based on the findings of fact and conclusions of law espoused herein, the Court must deny and dismiss Count VI of the supplemented complaint, and direct the entry of judgment thereon in favor of the defendants. The temporary restraining order previously entered on March 22, 1983 is hereby vacated; the provisional certificate of Burney's graduation is recalled and revoked; and Pawtucket is at liberty to drop Burney from its payroll and no longer to reserve the set-aside badge number.[23]

IT IS SO ORDERED.

---

21. The Court had originally, at a March 16, 1983 chambers conference, considered vacating the plaintiff's test results and ordering a re-test under court-supervised conditions. This was based on the plaintiff's affidavit, which insinuated that the re-test had not been fairly implemented. Such a re-test could not be held, however, because of an unrelated injury sustained by the plaintiff. After hearing Cerio's testimony on March 21, 1983, the Court revoked its March 16th order in this respect, *see Burney II* at 5, as Cerio persuaded the Court that the plaintiff had been accorded fundamental fairness in the administration of both the self-defense test and the re-test. The Court remains of that opinion. *See* note 7, *ante*.

22. Where, as here, there is no showing that the employer's rule disproportionately inveighs against members of a class protected by Title VII, the Court has no occasion to reach the issue of the "crucial fit ... between the test and job performance". *Boston Chapter N.A.A.C.P., Inc. v. Beecher*, 504 F.2d at 1022.

23. While the Court cannot, given its findings on Count VI, accord relief to the plaintiff or mandate the future conduct of the defendants, the Court has been impressed by the single-mindedness of Burney's unflagging desire to become a police officer and by her yeoman efforts to this end. Experience teaches that such dedication bodes well for ultimate success and achievement in most professional endeavors. Both Pawtucket and the Academy have, at this point in time, made a considerable investment (both in time and in taxpayer dollars) in Burney's training. She is positioned uninterruptedly to continue that training, as she has been regularly attending Academy sessions with the class of 1983–II. The Court believes that the public interest would, under these circumstances, be best served should the defendants see fit voluntarily to permit the plaintiff to re-take the self-defense course with that class; and, should she succeed in perfecting her skills to the point where she meets the Academy's requirements with respect to self-defense, that she then be graduated and assigned to active police duty in the ordinary course.